**UNITED STATES DISTRICT COURT**
**EASTER DISTRICT OF LOUISIANA**

SOUTHEAST LOUISIANA BUILDING                                    CIVIL ACTION
AND CONSTRUCTION TRADES
COUNCIL, AFL-CIO, AN
UNINCORPORATED ASSOCIATION

V.                                                                              NO.: 13-370

STATE OF LOUISIANA, EX REL.
BOBBY JINDAL, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
STATE OF LOUISIANA;

JAMES D. "BUDDY" CALDWELL, IN                                 SECTION "K"(5)
HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE
STATE OF LOUISIANA

<u>ORDER AND REASONS</u>

Before the Court are the Plaintiff's Motion for Summary Judgment, R. Doc. 39, and

Defendant's and Intervenors' Joint Motion for Summary Judgment, R. Doc. 40. The parties'

cross-motions for summary judgment present a challenge to a Louisiana statute as being

constitutionally preempted by the National Labor Relations Act ("NLRA"), 49 Stat. 449, as

amended, 29 U.S.C. § 151 *et seq*., and the Supremacy Clause, U.S. Const. art. VI, cl. 2. Having

considered the motions, memoranda, exhibits, and relevant law, the Court GRANTS the

Defendant and Intervenors' Motion for Summary Judgment and DENIES the Plaintiff's Motion

for Summary Judgment for reasons stated herein.

## I.      BACKGROUND

Plaintiff, Southeast Louisiana Building and Construction Trades Council, AFL-CIO

("Plaintiff" or "The Council"), is an unincorporated association comprised of member labor

organizations or building and construction trade unions throughout Southeast Louisiana. (Pl.'s

Mot. Summ. J. 12, R. Doc. 39).  The Council exists to represents its members' interests,

providing bargaining power and advancing the union sector of the construction market.  *Id.* at 5.

The Council's activities include negotiation of project labor agreements ("PLA" or "PLAs"), a

type of collective bargaining agreement, on behalf of its members.  *Id.*  In 2011, the Louisiana

legislature passed Act No. 134 ("Act 134") of the 2011 Regular Session, codified at La. R.S.

38:2225.5 (2014).  On March 19, 2013, the Plaintiff was informed by the City of New Orleans

that it could not enter into a potential PLA with the Council for the construction of the New

Orleans East Hospital District A by virtue of the prohibition of such agreements as circumscribed

by Act 134.  (*See* Def.'s & Inter. Mot. Summ. J. Ex. 3 at 5, R. Doc. 40).  In turn, Plaintiff filed a

Complaint on February 27, 2013, alleging that Act 134 is unconstitutional and unenforceable

naming Bobby Jindal, Governor of Louisiana, and James D. Caldwell, Attorney General for the

state of Louisiana, as Defendants.  On May 2, 2013, the Louisiana Chapter, the New Orleans-

Bayou Chapter, and the Pelican Chapter of Associated Builders and Contractors, Inc.,

(collectively "ABC" or "Intervenors") intervened.  On December 18, 2013, the Court granted

Defendants' motion and dismissed Governor Jindal from the action. Order, Dec. 18, 2013, R.

Doc. 23.

In its instant Motion for Summary Judgment, Plaintiff seeks a preliminary injunction

prohibiting the enforcement of Act 134 and a declaration that Act 134 is preempted by federal

law. *See* Pl. Mot. 1.[1] Defendant and Intervenors maintain, however, in their joint Motion for

---

[1]Plaintiff's Complaint also alleges that Act 134 violates the Contracts Clause of the United States Constitution, article I, § 10, clause 1. (Compl. ¶ 6, R. Doc. 1). Defendant and Intervenors argued in their Motion for Summary Judgment that the Plaintiff was not entitled to judgment as a matter of law on that claim, R. Doc. 40, and Plaintiff has neither offered a counter-argument in its Opposition nor presented any argument on that point in its own Motion for Summary Judgment, see R. Docs. 39 and 50. Therefore, Plaintiff has failed to discharge its burden on summary judgment, and "[i]f the moving party fails to discharge this burden, summary judgment must be denied—even if the nonmoving party has not responded to the motion." *John v. State of La. Bd. of Trustees for State Colleges & Universities*, 757 F.2d 698, 708 (5th Cir. 1985)(citations omitted). Moreover, the Court may not grant summary

Summary Judgment, that the controlling law compels judgment in their favor as the Louisiana statute is not preempted by the NLRA.  (Def.'s & Intervenors' Mot. Summ. J. 1, R. Doc 40).

A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The determination of whether a genuine issue of material fact exists is a question of law that must be decided by the court when raised by motions for summary judgment, despite the fact that the parties agree no factual issues exist.[2]  "[A] party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of his own motion."[3]  Cross-motions for summary judgment must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.[4]  If there is no genuine issue and one of the parties is entitled to prevail as a matter of law, the court will render summary judgment for that party.[5]  Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

judgment on grounds not requested by the moving party. *See Baker v. Metropolitan Life Ins. Co.,* 364 F.3d 624, 632 (5th Cir. 2004); *John Deere Co v. Am. Nat'l Bank, Stafford,* 809 F.2d 1190, 1192 (5th Cir. 1987).

[2]10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720 (3d ed. 1998)("[T]he determination whether a genuine issue concerning a material fact exists is itself a question of law that must be decided by the court. It does not depend upon what either or both of the parties may have thought about the matter."); *see John v. Louisiana,* 757 F.2d 698, 705 (5th Cir. 1985).

[3]10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720 (3d ed. 1998).

[4] *Shaw Constructors v. ICF Kaiser Engineers, Inc.,* 395 F.3d 533, 538–39 (5th Cir.2004); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2720 (3d ed. 1998)("The court must rule on each party's motion [for summary judgment] on an individual and separate basis, determining for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

[5] *Shaw Constructors,* 395 F.3d at 539 n. 9. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. § 2720 (3d ed. 1998) ("[I]f a party concedes that the facts are not disputed and makes no attempt to file counter-affidavits in response to the opponent's cross-motion under Rule 56 . . . . [Then] there is no genuine issue and one or the other party is entitled to prevail as a matter of law, [and] the court will render judgment."); *see United States v. Dooley,* 424 F.2d 1067, 1067-68 (5th Cir. 1970); *State Farm Mut. Auto. Ins. Co. v. Eubanks,* 620 F. Supp. 17, 17 (N.D. Miss. 1985), *aff'd,* 785 F.2d 1346 (5th Cir. 1986).

3

which that party will bear the burden of proof at trial. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)(citation and internal quotation marks omitted).

No party contends that genuine issues of material fact exist and each party seeks summary judgment in its favor as a matter of law.  Upon review of the competent summary judgment evidence, including the record and any admissible exhibits attached to the parties' motions,[6] the Court finds that no genuine issue of material fact exists.[7]  Thus, the Court must determine the party in whose favor judgment should be granted as a matter of law.  As Congressional intent is the "touchstone" of preemption,[8] a review of the relevant NLRA provisions is necessary in addition to an examination of the state legislation at issue.

### A.    Construction Industry under the NLRA and Project Labor Agreements

In 1935, Congress enacted the NLRA, Pub. L. No. 74–189, 49 Stat. 449, codified as amended, 29 U.S.C. § 151 *et seq.*, in which it articulated a national labor policy and created the National Labor Relations Board ("NLRB") to implement it.  *See N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 22–24, 57 S.Ct. 615, 81 L.Ed. 893 (1937).  The NLRA declared that it was the public policy of the United States that employees shall be free from interference, restraint, or coercion of employers of labor in self-organization for the purposes of collective bargaining or other mutual aid.[9]  The NLRA is concerned primarily with establishing an

---

[6]The Court notes that while Defendant and Intervenors objected to the inclusion of a letter from the Mayor of the City of New Orleans to Robert Hammond, attached as an exhibit as hearsay. However, the Court finds that this document is admissible pursuant to the business records exception to the hearsay rule, Fed. R. Evid. 803(b), and is nevertheless offered only for purposes of demonstrating notice to the Plaintiff. Moreover, the letter was made part of the record through Defendant's and Intervenors' own exhibit as attached to their Motion for Summary Judgment. *See* Def.'s Mot. Ex. 3, at 5.

[7]"A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Pylant v. Hartford Life and Accident Insurance* Company, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).

[8] *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194-95, 173 L. Ed. 2d 51 (2009).

[9] *See Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 558-59, 65 S. Ct. 1373, 1382-83, 89 L. Ed. 1782 (1945)("Not content with setting forth the central aim of the Wagner Act in the legislative reports, Congress in the Act itself defined its purposes. In view of the inequality between organized employers and employees devoid of 'full freedom of association or actual liberty of contract,' and of the 'denial by employers of the right of employees to organize

equitable process for determining terms and conditions of employment and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions. *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 753-54, 105 S. Ct. 2380, 2396, 85 L. Ed. 2d 728 (1985); *see H.K. Porter Co. v. N.L.R.B.*, 397 U.S. 99, 108, 90 S. Ct. 821, 826 (1970).

Section 7 of the NLRA guarantees employees the right to organize and join unions, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. 29 U.S.C. § 157. Section 8, on the other hand, concerns unfair labor practices. *See* 29 U.S.C. § 158. In 1947, the Taft-Hartley Act amended the NLRA and outlawed the closed shop, curtailed the strike and boycott, and declared that employees had the right to refrain from union activity, Labor Management Relations Act (Taft–Hartley Act), Pub. L. No. 80–101, 61 Stat. 136 (1947), codified as amended 29 U.S.C. § 141, *et seq. See N.L.R.B. v. Gen. Motors Corp.*, 373 U.S. 734, 740, 83 S. Ct. 1453, 1458, 10 L. Ed. 2d 670 (1963). In 1959, the Landrum-Griffin Act further restricted labor's picketing and boycott activities, and regulated internal union affairs. *See* Pub.L. No. 86-257, 73 Stat. 519 (1959); *Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 633, 87 S. Ct. 1250, 1262, 18 L. Ed. 2d 357 (1967); *Marriott In-Flite Servs. v. Local 504, Air Transp. Div., Transp. Workers of Am., AFL-CIO*, 557 F.2d 295, 298 (2d Cir. 1977)(citation omitted). One of the major aims of the 1959 Act was to limit "top down" organizing campaigns, in which

and the refusal by employers to accept the procedure of collective bargaining', it was 'declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.' Section 1. . . . It is an accurate summary of the Wagner Act to say that it aimed to equalize bargaining power between industrial employees and their employers by putting federal law behind the employees' right of association. The whole plan or scheme of the Wagner Act was to enable employees to bargain on a fair basis, freed from 'restraint or coercion by their employer' through the protection given by the federal government."(citation omitted)).

unions used economic weapons to force recognition from an employer regardless of the wishes of its employees. *Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 632, 95 S. Ct. 1830, 1840, 44 L. Ed. 2d 418 (1975).

Among the amendments made were the addition of Section 8(f) and modification of Section 8(e) of the NLRA, both of which made specific exceptions for the construction industry. 29 U.S.C. §§ 158(e) and (f); *see Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 230, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("Boston Harbor"). Section 8(f) specifically allows "prehire agreements," or agreements made between and employer and a labor organization covering employees not yet hired—only for those employees in the construction industry. 29 U.S.C. § 158; *see John Deklewa & Sons*, 282 N.L.R.B. 1375, 1380-81 (1987). "These agreements may be signed before the union represents a majority of the employer's employees, and may continue in duration through more than one of the employer's jobs, even if the employer goes through a high employee turnover." *Todd v. Jim McNeff, Inc.,* 667 F.2d 800, 801-02 (9th Cir.) *aff'd*, 459 U.S. 1013, 103 S. Ct. 370, 74 L. Ed. 2d 505 (1982) and *aff'd*, 461 U.S. 260, 103 S. Ct. 1753, 75 L. Ed. 2d 830 (1983). Without this exception, forming a prehire agreement might have constituted an unfair labor practice, "for such an agreement (naming the unions to which all employees of all contractors and subcontractors must belong) might be seen as interfering with employees' rights to bargain through representatives of their own choosing, in violation of §§ 8(a)(1) and 7, *see id.* §§ 158(a)(1) & 157, or unreasonably discriminating against those who are not union members, in violation of § 8(a)(3)[, *s]ee id.* § 158(a)(3)."[10]

---

[10] *Associated Builders & Contractors of Massachusetts/Rhode Island, Inc. v. Massachusetts Water Res. Auth.,* 935 F.2d 345, 362 (1st Cir. 1991) (Breyer, J., dissenting), *rev'd sub nom. Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc*., 507 U.S. 218, 113 S. Ct. 1190, 122 L. Ed. 2d 565 (1993)("Boston Harbor"); *see also N.L.R.B. v. Haberman Const. Co*., 618 F.2d 288, 304-05 (5th Cir.

In enacting this exception, Congress recognized that the use of prehire agreements in the construction industry antedated the federal labor legislation proscribing them. *See* S.Rep. 86-187 at 28, 55-56 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2344; H.R. Rep. No. 86-741 at 19-20 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2441–2442; *Associated Builders & Contractors*, 935 F.2d at 364 (Breyer, J., dissenting). As a practical matter, prehire agreements addressed unique circumstances in the construction industry, including short-term employment, the employer's need to know labor costs in advance of a project before making an accurate bid, and the employer's need for a steady supply of labor for referral. *See* H.R. Rep. No. 86-741 at 19 (1959), 1 Leg. Hist. 777; *reprinted in* 1959 U.S.C.C.A.N., 2424, 2442. Despite the concern over employees' right to select their bargaining representatives,[11] the Senate Report noted that employees would not be employed for a long enough period of time to formally elect a bargaining representative. *N.L.R.B. v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 349, 98 S. Ct. 651, 658, 54 L. Ed. 2d 586 (1978) ("Representation elections in a large segment of the industry [were] not feasible to demonstrate [] majority status due to the short periods of actual employment by specific employers. S. Rep. 86-187 at 55 (1959), 1 Leg. Hist. 541–542; History 341–342, U.S. Code Cong. & Admin. News 1959, pp. 2318, 2373")). Thus, in Section 8(f) Congress expressly provided that such agreements "could contain 7-day union-security clauses, exclusive hiring-hall referral procedures, and training and seniority requirements as hiring priorities." *Deklewa*, 282 N.L.R.B. at 1380-81. Mindful of employees' free choice to select bargaining representatives,

---

1980) *rev'd on other grounds en banc*, 641 F.2d 351 (5th Cir. 1981)(stating that it was an unfair labor practice for an employer to enter into this type of agreement with the union before it had attained majority status).

[11] *See Local Union No. 103,* 434 U.S. at 349 ("Privileging unions and employers to execute and observe prehire agreements in an effort to accommodate the special circumstances in the construction industry may have greatly convenienced unions and employers, but in no sense can it be portrayed as an expression of the employees' organizational wishes.").

Congress also provided in Section 8(f) that employees may demand an election pursuant to Section 9(c) or 9(e) be held despite the existence of a prehire agreement. *Deklewa*, 282 NLRB at 1380-81.

In addition, in 1959 Congress added the "construction industry proviso" to Section 8(e). 28 U.S.C. § 158(e); *see* 1 Bureau of National Affairs, The Labor Reform Law Labor-Management Reporting and Disclosure Act of 1959 93 (1959). Section 8(e) generally prohibits "hot cargo" agreements or agreements between a union and secondary employer whereby the secondary employer agrees to help the union (engaged in a dispute with a primary employer) by refusing to do business with that primary employer. *See Woelke & Romero Framing, Inc. v. N.L.R.B.,* 456 U.S. 645, 654-55, 102 S. Ct. 2071, 72 L. Ed. 2d 398 (1982). The construction industry proviso specifically exempted employers in the construction industry so that its prohibition of hot-cargo clauses would not prevent parties in the construction industry from entering into prehire agreements, which traditionally included a subcontracting restriction "requiring the general contractor to award bids only to subcontractors who would sign the prehire agreement." *Associated Builders and Contractors*, 935 F.2d 345, 363-64 (1st Cir. 1991) (citing 105 Cong. Rec. S16, 414 (daily ed. September 3, 1959) (statements of Sen. Kennedy); 105 Cong.Rec. S16,414 (daily ed. September 3, 1959)(statements of Rep. Thompson)). The provision specifically addressed the problem of picketing a single non-union subcontractor on a multi-employer building project, and the close relationship between contractors and subcontractors at the jobsite. *Connell Const. Co.*, 421 U.S. at 629-30. Thus Section 8(e) permits a general contractor's prehire agreement to require a contractor not to hire other contractors

performing work on that particular project site unless they agree to become bound by the terms of that agreement.[12]

The Plaintiff contends that the NLRA preempts Act 134 because the Act prohibits the use of a project labor agreement, a Section 8(f) prehire agreement, on public construction projects. The Supreme Court has determined that a project labor agreement or PLA is a "valid labor contract" under Sections 8(e) and 8(f) of the NLRA. *Boston Harbor,* 507 U.S. at 230, 113 S. Ct. at 1197. A PLA is a type of prehire agreement that applies to a specific construction project and lasts for the duration of the project. Cong. Res. Service, Project Labor Agreements, 1. "Subcontracting restrictions and prehire agreements are typically combined with hiring hall and grievance arbitration arrangements in a project labor agreement."[13] "The primary advantage of this type of agreement, as opposed to any other prehire agreement, is that a PLA provides for grievance resolution procedures that last for the duration of the project and do not delay the project."[14]

PLAs generally apply to all work performed under a specific contract or project or at a specific geographic location. Under the typical terms of a PLA, the PLA will (1) require an employer recognize the signatory union or group of unions as the exclusive collective bargaining agent for all covered employees; (2) supersede all other collective bargaining agreements; (3) prohibit strikes and lockouts; (4) require hiring through union referral systems or union hiring halls; (5) require all contractors and subcontractors to become signatory to the agreement, which

---

[12] *Boston Harbor*, 507 U.S. at 230 (citing *Woelke,* 456 U.S. at 657, 102 S.Ct. at 2078). Although this type of subcontracting agreement could exert "top down" pressure on employees, Congress decided to accept such pressure and enacted this exception ensuring that these exclusive subcontracting agreements would remain lawful as they were part of the pattern of collective bargaining in the construction industry. *Woelke,* 546 U.S. at 657 and 664.

[13] Henry Perritt, *Keeping the Government Out of the Way: Project Labor Agreements Under the Supreme Court's Boston Harbor Decision*, 12 Lab. Law. 69, 73 (1996).

[14] Jolie Siegel, *Project Labor Agreements and Competitive Bidding Statute*, 3 U. Pa. J. Lab. & Emp. L. 295, 296 (2001).

in turn, may require contractors to use the unions' apprenticeship programs and to contribute to union health, pension, and vacation funds; (6) establish uniform work rules covering overtime, working hours, and dispute resolution; and (7) prescribe craft wages.  *See* U.S. Congressional Research Service, *Project Labor Agreements*, 7-5700, Gerald Mayer, July 1, 2010, at 4; *see Johnson v. Rancho Santiago Cnty. Coll. Dist.,* 623 F.3d 1011, 1017 (9th Cir. 2010).  Often, the requirement that a winning bidder on a project agree to a PLA is incorporated directly into the bid specifications.  *See Associated Gen. Contractors v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1180 (9th Cir. 1988); *Michigan Bldg. & Constr. Trades Council, AFL-CIO v. Snyder*, No. 12-13567, 2012 WL 6155964, at *1 (E.D. Mich. Nov. 15, 2012) *rev'd sub nom. Michigan Bldg. & Constr. Trades Council v. Snyder*, 729 F.3d 572 (6th Cir. 2013).  Taken together, as one court has opined, PLAs "effectively unionize[] an entire construction project because all union and non-union contractors must comply with certain union protocol and procedure." *Michigan Bldg. & Constr. Trades Council, AFL-CIO v. Snyder*, 846 F. Supp. 2d 766, 772 (E.D. Mich. 2012)(citing *Cent. Iowa Bldg. and Constr. Trades Council, AFL-CIO v. Branstad*, No. 11—00202, 2011 WL 4004652 at *1 (S.D.Iowa, Sept. 7, 2011)); *see John T. Callahan & Sons, Inc. v. City of Malden*, 713 N.E.2d 955, 960-61 n.9 (Mass. 1999).

In contracting for construction projects, a PLA may come into effect in a number of different scenarios. *See Snyder*, 846 F. Supp. 2d at 772.  A union building trades council may negotiate and enter into a PLA with a construction manager acting as an agent for the owner-developer or directly with the owner-developer; the owner-developer then incorporates a requirement into bid specifications that successful bidders agree to enter or adhere to a PLA; the trades council could also enter into a PLA with a series of projects over a fixed period of time; or

a general contractor could independently negotiate a PLA with trades councils either before or after being awarded the work. *Id.*

### B.     Act 134

In 2011, the Louisiana legislature enacted Act No. 134 of the 2011 Regular Session ("Act 134" or "the Act"), adding a new provision to Louisiana's pre-existing Public Bid Law, [15] now codified as Louisiana Revised Statute § 38:2225.5 (2014). Act 134, as enacted, applies to each "public entity," which as defined in the statute, includes the State of Louisiana or any agency, board, commission, department, public corporation of the state, or any political subdivision of the state.[16]  The Act creates restrictions for each public entity, "when engaged in procuring products or services or letting contracts for construction, manufacture, or operation of public works paid for in whole or in part by state or local funds" or when overseeing the same.[17] Specifically, Act 134 prohibits certain conditions from being included in "bid specifications, project agreements, and other controlling documents, entered into, required, or subject to

---

[15]Generally, Louisiana's Public Bid Law mandates that public entities may not waive any requirements of or take any action inconsistent with the public bid law. *See* La. R.S. § 38:2212(B)(1)("The provisions and requirements of this Section and those stated in the bidding documents shall not be waived by any entity."); *Concrete Busters of Louisiana, Inc. v. Bd. of Comm'rs of the Port of New Orleans*, 2010-1172 (La. App. 4 Cir. 2/2/11), 69 So. 3d 484, 487 (La. Ct. App. 2011)(citing *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Authori*ty, 04–0211 (La. 3/18/04), 867 So.2d 651, 656). "Louisiana's Public Bid Law, set forth in La. R.S. 38:221[1], *et seq.*, is a prohibitory law founded on public policy." *Hamp's Const., L.L.C. v. City of New Orleans*, 2005-0489 (La. 2/22/06), 924 So. 2d 104, 107 (citing *Broadmoor*, 867 So. 2d at 656; *La. Associated Gen. Contr., Inc. v. Calcasieu Parish School Bd.,* 586 So.2d 1354, 1359 (La.1991)). Through the Public Bid Law, the Louisiana "legislature has specifically prescribed the conditions upon which it will permit public work to be done on its behalf or on behalf of its political subdivision."  *Hamp's Const.*, 924 So. 2d at 107.

[16] La. R.S. § 38:2211 (2014) ("'Public entity' means and includes the state of Louisiana, or any agency, board, commission, department, or public corporation of the state, created by the constitution or statute or pursuant thereto, or any political subdivision of the state, including but not limited to any political subdivision as defined in Article VI Section 44 of the Constitution of Louisiana, and any public housing authority, public school board, or any public officer whether or not an officer of a public corporation or political subdivision. "Public entity" shall not include a public body or officer where the particular transaction of the public body or officer is governed by the provisions of the model procurement code.").

[17] *Id.* at (A) ("Except as provided in Subsection E of this Section or as required by federal law, each public entity, when engaged in procuring products or services or letting contracts for construction, manufacture, or operation of public works paid for in whole or in part by state or local funds, or when overseeing or administering such procurement, construction, manufacture, or operation, shall ensure that bid specifications, project agreements, and other controlling documents, entered into, required, or subject to approval by the public entity do not . . . .").

approval by the public entity." La. R.S. 38:2225.5(A). The Act provides, in relevant part, that these documents may not:

> (1) Require bidders, offerors, contractors, subcontractors, or operators to:
> > (a) Enter into or adhere to agreements with one or more labor organizations on the same or related projects.
> > (b) Enter into any agreement whereby the public entity is required to remain neutral toward any labor organization.
> > (c) Pay predetermined or prevailing wages.
> (2) Discriminate against bidders, offerors, contractors, subcontractors, or operators for refusing to:
> > (a) Become or remain signatories or otherwise adhere to agreements with one or more labor organizations on the same or related projects.
> > (b) Enter into any agreement whereby the public entity is required to remain neutral toward any labor organization.
> (3) Require any bidders, offerors, contractors, subcontractors, or operators to enter into, adhere to, or enforce any agreement that requires any employee as a condition of employment to:
> > (a) Become a member of or become affiliated with a labor organization.
> > (b) Pay dues or fees to a labor organization over the employee's objection.

*Id.* at (A).  The prohibited conditions in Section (A) along with Section (B) effectively prohibit those conditions typically included in PLAs, as discussed above,[18] on any public works project upon which public funds are expended or any construction project on which the public entity provides financial assistance, issues a grant, or enters into a cooperative agreement.[19]  The Act also prohibits any inclusion of a provision that a bidder, offeror, contractor, subcontractor, or operator be required to (or be discriminated against for refusing to) enter into any agreement requiring the public entity remain neutral toward any labor organization.  To enforce the Act, interested parties—those who will be involved in the negotiation of any construction project or a

---

[18] *See also* Pl.'s Mem., R. Doc. 39 at 5; Pl.'s Undisputed Material Facts, R. Doc. 39-4 at ¶18). These common provisions include union hiring hall provisions, predetermined or prevailing wages, and the requirement that all contractors become signatories to the PLA. To the extent the Plaintiff contends that the Act prohibits PLAs in general, the Court will consider the separately listed conditions in Section (A) as part and parcel of the argument.
[19] *Id.* at (A) and (B)("No public entity shall provide financial assistance, issue a grant, or enter into a cooperative agreement for any project a condition of which requires that bid specifications**,** project agreements, or other controlling documents pertaining to the financial assistance, grant, or cooperative agreement contain any of the elements prohibited in Subsection A of this Section.")

taxpayer—may challenge a bid specification or other controlling document that violates the provisions of the section.[20]  The legislature provided limits of the Act, however, stating that "[n]othing herein shall prohibit contractors or subcontractors from voluntarily entering into agreements described in this Section." *Id.* at (C).  Further, the Act does not apply to any "public-private agreement" for a construction project where the private entity has the right to control its labor relations with its own employees as permitted by the NLRA.[21]

## III.    DISCUSSION

Plaintiff argues that the NLRA preempts Act 134 because the Act either directly or indirectly regulates NLRA-protected collective bargaining rights of employers and public and private project owners in all publicly financed construction or other operations.  Plaintiff argues that the Act is regulatory as it applies to all construction projects funded in whole or part by the state and all public entities. Plaintiff asserts that the organization, on behalf of its employees, has a right under Section 7 of the NLRA to collectively bargain for project labor agreements, which are specifically authorized under Section 8 of the NLRA, with the State. Plaintiff argues that the Act regulates this protected activity by prohibiting public entities from entering (or deciding whether to enter) into PLAs either through incorporation in bid specifications or controlling documents on all public works projects (or related project) paid for in whole or in part by public funds or on any project on which the public entity provides financial assistance, issues grants, or

---

[20] *Id.* at (D)("Any interested party, which shall include a bidder, offeror, contractor, subcontractor, operator, or taxpayer, shall have standing to challenge any bid specification, project agreement, neutrality agreement, controlling document, grant, or cooperative agreement which violates the provisions of this Section. Furthermore, such party is authorized to and shall receive injunctive relief to prevent violations of this Section upon a proper showing under the standards of the Code of Civil Procedure.").

[21] *Id.* at (E)(4) ("The provisions of this Section shall not apply to the following: . . . (4) Any public-private agreement for any construction or infrastructure project in which the private entity, as a condition of its investment or partnership with the public entity, requires that the private entity have the right to control its labor relations policy with its own employees and the employees of its contractors and subcontractors in any manner permitted by the National Labor Relations Act, 29 U.S.C. 151 et seq.").

enters into cooperative agreements. Plaintiff also contends that the Act, in section (A)(3)(c), prohibits provisions requiring the use of union hiring halls, as employees must register with a union hiring hall or "affiliate" with the sponsoring union "and, if required by the controlling bargaining agreement, pay referral fees to the union." (Pl.'s Mem. Supp. Mot. Summ. J., 9). Further, Plaintiff argues that Section (A)(2)(b) prohibits bidders, offerors, contractors, and subcontractors from entering into neutrality agreements obligating a public entity remain neutral to a labor union facilitating voluntary recognition of a collective bargaining agent, and voluntary recognition is undisputedly lawful. Finally, Plaintiff argues that the enforcement provision in Section (D) further evidences its regulatory nature.  Thus, Plaintiff avers that the Act interferes with federal labor policy and upsets a balance of power established by the NLRA by adopting a statute prohibiting PLAs and other collective bargaining relationships.

Defendant and Intervenors argue, however, that Act 134 is not preempted by the NLRA as it is a narrow, proprietary law with the purpose of efficiently procuring construction services. Defendant and Intervenors argue the law is not regulating any protected activity under the NLRA or interfering with the balance of power established by the NLRA.  They state that the legislation was passed to foster open competition in the competitive bidding process for state-funded construction projects as part of the Public Bid law, narrowly applies only to those projects funded by the state, and is written to protect employee rights under the NLRA.  Plaintiff overstates the reach of the legislation, they argue, as Act 134 does not prohibit the use of PLAs between private contractors and subcontractors on public projects but only prohibits public entities from entering into PLAs on construction projects.  They assert that Act 134 similarly does not prohibit private parties from entering into any other bargaining agreement or the use of hiring halls, as the Act makes no mention of union hiring halls but simply reinforces existing

Louisiana's Right to Work Law, Louisiana Revised Statutes section 23:981, *et seq.*, and leaves the labor organizations are free to negotiate neutrality agreements with the State. Thus, Defendant and Intervenors argue the Act is not preempted because law has no effect outside of contracts with the State. Further, the Act is not preempted, they argue, because it does not regulate activities that are protected by the NLRA; they assert that labor organizations, as opposed to employees, have no right to negotiate PLAs under Section 7 of the NLRA with the State.

### A.    NLRA Preemption

It is a fundamental principle of the Constitution that the Supremacy Clause gives Congress the power to preempt state law. *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L.Ed.2d 352 (2000); *see* U.S. Const. art. VI, cl. 2. "In deciding whether a federal law pre-empts a state statute, our task is to ascertain Congress' intent in enacting the federal statute at issue," *Metro. Life*, 471 U.S. at 738, as Congress' intent is "the ultimate touchstone in every pre-emption case," *Wyeth,* 555 U.S. at 565 (citation and internal quotation marks omitted). In addition, in all preemption cases "and particularly in those in which Congress has legislated," the court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth,* 555 U.S. at 565 (citations and internal quotation marks omitted).

The topic of preemption in federal labor law "presents one of the densest thickets in all of labor and employment law," as one commentator has opined and has further declared that "the Supreme Court has decided more cases touching on federal preemption than on any other legal

issue in the field of collective bargaining."[22]  The NLRA contains no express statutory pre-emption provision, *Metro Life*, 471 U.S. 724, 747, nor otherwise indicates a congressional intent to usurp the entire field of labor-management relations, *Brown v. Hotel & Rest. Employees & Bartenders Int'l Union Local* 54, 468 U.S. 491, 501-02, 104 S. Ct. 3179, 3185, 82 L. Ed. 2d 373 (1984). The Court has thus noted that while "in passing the NLRA Congress largely displaced state regulation of industrial relations," *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286, 106 S. Ct. 1057, 1061, 89 L. Ed. 2d 223 (1986), the Court could not "declare pre-empted *all* local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions [as] much of this is left to the States." *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 289, 91 S.Ct. 1909, 1919, 29 L.Ed.2d 473 (1971)(emphasis added).  Although "controversy continues over the Act's pre-emptive scope,"[23] the Supreme Court has articulated two distinct NLRA pre-emption principles: *Garmon* preemption and *Machinists* preemption, *Metro Life*, 471 U.S. at 748.

The first preemption principle, *Garmon* preemption, precludes state interference with the NLRB's primary jurisdiction to determine in the first instance what kind of conduct is either prohibited or protected by the NLRA.  *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775.  Under *Garmon,* the NLRA preempts state action where the regulated activity is protected, prohibited, or arguably protected under Sections 7 and 8 and thus would be within the primary jurisdiction of the NLRB. *Id.* at 244.  When it is not clearly protected but it is "arguably" protected, an inflexible application of preemption is avoided. *Id.* at

---

[22] Stephen F. Befort & Bryan N. Smith, *At the Cutting Edge of Labor Law Preemption: A Critique of Chamber of Commerce v. Lockyer,* 20 Lab. Law. 107, 107 (2004).

[23] *Gould,* 475 U.S. at 286; *see Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 623, 106 S. Ct. 1395, 1403, 89 L.Ed.2d 616 (1986)(623)(Rehnquist, J., dissenting) ("The entire body of this Court's labor law pre-emption doctrine has been built on a series of implications as to congressional intent in the face of congressional silence, so that we now have an elaborate pre-emption doctrine traceable not to any expression of Congress, but only to statements by this Court in its previous opinions of what Congress must have intended.")

245.  Courts consider whether there is a significant state interest in protecting its citizens from the conduct or whether state jurisdiction would entail little risk of interfering with the uniform labor policy. *See Gould*, 475 U.S. at 291 (preemption should not be inferred where policies address conduct of peripheral concern to the NLRA or deeply rooted local interests); *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters,* 436 U.S. 180, 180, 98 S. Ct. 1745, 1749, 56 L. Ed. 2d 209 (1978)(finding deeply local interests to be at stake such that *Garmon* preemption was inappropriate).  A state law conflicts with the NLRA's provisions or underlying goals and policies if it stands as an obstacle to the accomplishment of its purposes. *Hotel Employees,* 468 U.S. at 501 (internal quotation marks and citation omitted).

The second preemption principle, *Machinists* preemption, forbids the states from regulating conduct that Congress intended to be unregulated. *Machinists v. Wis. Emp't Relations Comm'n*, 27 U.S. 132, 140 (1976); *Metro Life*., 471 U.S. at 749. Even if the conduct is not protected or prohibited by the NLRA, the act may be preempted if it is within a zone that Congress intended to leave unregulated or left to the "free play of economic forces." *Machinists;* 27 U.S. at 140. "*Machinists* pre-emption is based on the premise that 'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'" *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65, 128 S. Ct. 2408, 2412, 171 L. Ed. 2d 264 (2008)(quoting *Machinists,* 427 U.S. at 140, n. 4)(internal quotation marks omitted).

However, preemption only occurs when a state regulates in a protected zone under *Garmon* or *Machinists*.  *See Boston Harbor*, 507 U.S. at 226-27; *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1413 (9th Cir. 1996) ("A prerequisite to pre-emption [under the NLRA] is a finding that the state or local action in question constitutes *regulation* of labor

relations between employers and employees."). "In general, Congress intends to preempt only state regulation, and not actions a state takes as a market participant." *Johnson,* 623 F.3d at 1022 (citation omitted); *see Cardinal Towing & Auto Repair, Inc., v. City of Bedford, Tex.*, 180 F.3d 686, 691 (5th Cir. 1999).

### B.  The Market Participant Doctrine: Exception to Preemption

Three Supreme Court cases primarily define the scope of the "market participant" exception to preemption.  In *Gould*, the Court addressed a Wisconsin "debarment" statute that forbade state procurement agents from using state funds to purchase products manufactured or sold by "labor law violators," or those employers who had violated the NLRA three times within a five-year period.  475 U.S. 282.  Wisconsin conceded that it did not have the power to bar its residents from doing business with repeated violators of the NLRA but argued that the statute was not unlawful because the statute merely regulated the spending power of its procurement officers.  *Id.* at 287.  The Court held this to be a "distinction without a difference" because the statute plainly served as a means of enforcing the NLRA. *Id.* By "flatly prohibiting state purchases from repeat labor law violators" the state was not functioning as a private purchaser of services and for "all practical purposes, Wisconsin's debarment scheme [was] tantamount to regulation." *Id.* at 289.

The *Gould* court discussed the qualitative difference with state action as compared to private purchasers, noting that a private purchaser could boycott labor law violators without offending the NLRA. "The Act treats state action differently from private action not merely because they frequently take different forms," the Court noted, but also because "States simply are different from private parties and have a different role to play." *Id.* at 290.  Yet the Court

emphasized that the purpose and effect of the law in that case did not fall within any exception to the rule and found the Wisconsin statute preempted under *Garmon*. *Id.* at 291.

The Court answered the open question of whether a State may act without offending the preemption principles of the NLRA when it acts as a proprietor rather than a regulator in *Boston Harbor*, 507 U.S. 218, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993).  In *Boston Harbor*, the Court addressed the validity of a project labor agreement adopted by the Massachusetts Water Resources Authority (MWRA) and entered into by its project manager, Kaiser Engineers, Inc., and Building and Construction Trades Council and affiliated organizations (BCTC).  *Id.* at 221. The Association of Builders and Contractors challenged the action arguing that it was preempted by the NLRA.  *Id.* The PLA in *Boston Harbor* pertained to a $6.1 billion project to clean up the Boston Harbor by building treatment facilities over which MWRA had the primary responsibility to fund, decide contract awards, supervise, and eventually own. *Id.* at 221.

The Court found that the PLA was a valid labor contract under Sections 8(f) and 8(e) of the NLRA, and that those provisions also applied to the State and its political subdivision, the MWRA.  *Id*. at 231. Though the NLRA excludes the State from the definition of an "employer," the Court found that Congress did not intend to distinguish between a private purchaser or a public entity acting in the construction industry in allowing the collective bargaining agreements under Sections 8(f) and 8(e); absent express intent to disallow states from managing its own property and pursuing proprietary interests, and where analogous private conduct would be permitted, the Court refrained from inferring a restriction on the states' ability to enter into prehire agreements.  *Id.* at 231–232.

In making a distinction between state as regulator or state as proprietor, the Court revisited the analogy to a private actor in *Gould*. The Boston Harbor Court agreed with the

Gould court that states play a qualitatively different role than private persons—when the state acts as a regulator. *Id.* at 229. The distinction between a state and a private actor is "far less significant when the State acts as a market participant with no interest in setting policy." *Id.* at 229. Thus, the Court in *Boston Harbor* emphasized that the statute was regulatory in *Gould* because the statute at issue "addressed employer conduct unrelated to the employer's performance of contractual obligations to the State, and because the State's reason for such conduct was to deter NLRA violations." *Id.* at 228–29.

As applied in that case, the Court found the MWRA was acting as a proprietor in entering into a PLA "to ensure that the project would be completed quickly and effectively at lowest cost." *Id.* at 232. Moreover, the challenged action was "tailored to one particular job," so there was no reason to distinguish the incentives there from those elsewhere in construction industry which are legitimate. *Id.* at 232 (citing *Woelke*, 546 U.S. at 662, and n.14).

In the most recent Supreme Court announcement on NLRA preemption and the market participant exception, the Supreme Court found that a California state statute was not subject to the market participant exception and was subject to NLRA preemption under *Machinists*. *Brown*, 554 U.S. 60, 120 S.Ct. 2408, 171 L.Ed.2d 264 (2008). The statute at issue in *Brown* prohibited certain employers that receive state funds—whether by reimbursement, grant, contract, use of property, or pursuant to a state program—from using such funds to assist, promote, or deter union organizing. *Id.* at 63. The preamble of the statute candidly acknowledged that it was the state of California's policy not to interfere with an employee's choice about whether to join a union and thus it would not subsidize efforts by employers to either promote or deter unionizing. *Id.* The Court found it "beyond dispute" that the state was regulating as it was neither specifically tailored to one particular job nor a legitimate response to

state procurement restraints or to local economic needs. *Id.* at 70. The legislative purpose was not "the efficient procurement of goods and services" but rather, as acknowledged in the preamble, "furtherance of a labor policy." *Id.* The purpose was further illustrated by the fact that the statute was a negative restriction on employer speech about unionization as opposed to an affirmative requirement about the use of state funds for the relevant grant program and the fact that it was not applied uniformly, exempting certain employer advocacy activities that promoted unions. *Id.* at 70–71. The Court held that the NLRA preempted the statute under *Machinists* as it interfered and regulated the employer's non-coercive speech about unionization, an area Congress left unregulated. *Id.* at 66.

## C.   Lower Courts' Application of the Market Participant Doctrine

In the wake of *Boston Harbor*, the lower courts applying the market participant exception have examined critical factors that evidence proprietary conduct rather than regulatory conduct. With facts closely resembling that of *Boston Harbor,* courts have commonly shielded contract specifications or contracts over projects with defined temporal or project limits from preemption or those contracts based on "ad hoc" decisions.[24] On the other hand, where the facts resemble those of *Gould,* courts have found preemption when government entities seek to advance general societal goals rather than narrow proprietary interests (actions serving the government's own

---

[24]*See, e.g.*, *Colfax v. Illinois State Toll Highway Authority*, 79 F.3d 631, 634 (7th Cir. 1996) (requirement that contractor adhere to "area-wide" labor agreement was not preempted by NLRA); *Johnson* , 623 F.3d at 1017 (9th Cir.2010) (state agency entering into Project Stabilization Agreement covering many individual projects but limited to time period of three years was market participation and not subject to NLRA preemption); *Hotel Employees & Restaurant Employers Union, Local 57 v. Sage Hospitality Res.*, LLC, 390 F.3d 206 (3rd Cir. 2004) (upholding city requirement of a neutrality agreement as a condition of tax financing); *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 35 (D.C.Cir.2002); *N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1005* (7th Cir. 2005) (state grant subsidizing of renewable-fuel plants conditioned on entering into PLA was proprietary and not subject to NLRA preemption); *Bldg. Industry Electrical Contractors Ass'n v. City of New York*, 678 F.3d 184 (2d Cir. 2012) (several PLAs entered into by the City of New York, indistinguishable from Boston Harbor PLA, were proprietary and thus not preempted by NLRA); *Branstad*, WL 4004652 at *1(finding executive order prohibiting use of PLAs was proprietary and not preempted by the NLRA).

needs) through the use of their spending and contracting power.[25]  *Gould* and *Boston Harbor*

reflect "polar outcomes despite the fact that both involved an exercise of spending or

procurement power." *Sage Hospitality*, 390 F.3d at 214. The pivotal difference, as the Third

Circuit stated, is that in *Gould,* the state "deployed its spending authority to achieve a goal far

broader than merely protecting or fostering its own investment or proprietary interest," while in

*Boston Harbor* "the public agency limited its spending conditions to the protection of its

investment or proprietary interest." *Id.*

The Fifth Circuit in *Cardinal Towing* succinctly distilled these factors, based on the

reasoning of *Boston Harbor*, in a two-part test since cited with approval by other Circuit courts.[26]

The key, the Fifth Circuit stated, is to focus on two questions: (1) whether the challenged action

essentially reflect the entity's own interest in its efficient procurement of needed goods and

services, as measured by comparison with the typical behavior of private parties in similar

---

[25] *See, e.g., Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1339 (D.C.Cir. 1996) (executive order barring federal government from contracting with companies that permanently replaced striking workers was preempted by the NLRA); *Van-Go Transport Co., Inc. v. New York City Bd. of Education,* 53 F.Supp.2d 278, 288 (E.D.N.Y. 1999) (policy of refusing to conditionally certify replacement workers that was applied to all of department's student transport contracts was preempted under NLRA); *Aeroground, Inc. v. City & Cnty. of San Francisco*, 170 F. Supp. 2d 950, 956 (N.D. Cal. 2001)(card check rule applying to all employers at airport effectively operated as licensing scheme and was preempted); *Dillingham Const. NA, Inc. v. Cnty. of Sonoma*, 190 F.3d 1034, 1037 (9th Cir.1999)(state law requiring public works contractors pay prevailing wages but allowing apprentices be paid less under state-approved apprenticeship program was preempted by the NLRA); *Healthcare Ass'n of New York State, Inc. v. Pataki*, 471 F.3d 87 (2d Cir. 2006)(statute prohibiting state funds be used for purposes of encouraging or discouraging union organization was regulatory and preempted by the NLRA); *Idaho Bldg. and Constr. Trades Council, AFL-CIO v. Wasden*, 836 F.Supp.2d 1146 (D. Idaho 2011);  *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 108 F. Supp. 2d 73, 81 (D.R.I. 2000)(City's grant of favorable tax treatment in exchange for use of PLA was regulatory and preempted by NLRA); *Ohio State Ohio State Bldg. & Constr. Trades Council v. Cuyahoga Cnty. Bd. of Commissioners*, 781 N.E.2d 951 (Ohio 2002) (Ohio statute prohibiting public authorities from entering into or enforcing project labor agreements on public construction projects was regulatory and preempted by the NLRA); *see also Cardinal Towing*, 180 F.3d at 692 (listing similar cases).

[26] 180 F.3d 686 (5th Cir. 1999); *see Pataki*, 471 F.3d 87 (Second Circuit adopting *Cardinal Towing's* test); *Johnson*, 623 F.3d 1011 (Ninth Circuit adopting *Cardinal Towing's* test); *Hospitality Resources,* 390 F.3d 206 (Third Circuit adopting test similar to *Cardinal Towing*); *Lavin*, 431 F.3d 1004 (Seventh Circuit adopting test similar to *Cardinal Towing*). The Court notes that while the Defendants argue that only one prong of the *Cardinal Towing* test need be met by the state action, supported by *Johnson,* 623 F.3d at 1024, the Fifth Circuit has applied both prongs in a more recent case, see *Stucky v. City of San Antonio*, 260 F.3d 424, 434 (5th Cir. 2001) *cert. granted, judgment vacated,* 536 U.S. 936, 122 S. Ct. 2617, 153 L. Ed. 2d 801 (2002) *abrogated by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 122 S. Ct. 2226, 153 L. Ed. 2d 430 (2002).

circumstances; and (2) whether the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem. *Cardinal Towing,* 180 F.3d at 693.

    As acknowledged by the Fifth Circuit in *Cardinal Towing*, the point at which the action evidences a primary goal of encouraging labor policy[27] rather than a narrow proprietary goal, however, remains unclear.[28]  Some courts have found a "blanket prohibition," similar to a boycott, converts an action based on the state's spending power into a regulatory one.[29]  Yet other courts disagree.[30]  Indeed, the only two Circuit courts to consider a blanket rule in the context PLAs in government construction have found the blanket prohibition to be proprietary and not subject to NLRA preemption.  *See Allbaugh,* 295 F.3d 28; *Michigan Bldg. & Const. Trades Council v. Snyder*, 729 F.3d 572 (6th Cir.), *reh'g and reh'g en banc denied* (Nov. 27, 2013).

    In *Allbaugh*, the D.C. Circuit held that President George W. Bush had the authority to issue an executive order that provided that no federal agency receiving federal assistance for a construction project may require bidders or contractors to enter (or prohibit them from entering into) a project labor agreement.  295 F.3d at 29. The effect was to "leave to the contractors working on the project the choice whether to enter into, and to require their subcontractors to

---

[27] *See Reich*, 74 F.3d at 1339. In *Reich,* the President's executive order, though based in economic rationale, was a policy was based on the belief that allowing permanent replacement of strikers would prolong strikes and lead to the loss of the skill of the strikers ultimately resulting in less efficient and economical performance by that contractor. *Id.* at 1335.  This, the court stated, "surely goes to the heart of United States labor relations policy," and sets primarily a "labor policy" rather than primarily a "procurement policy." *Id.* at 1337.

[28] *See Cardinal Towing,* 180 F.3d at 692. As the Supreme Court has recently opined, "[i]n some cases . . . the line between regulatory and proprietary conduct has soft edges." *Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 133 S. Ct. 2096, 2102-03, 186 L. Ed. 2d 177 (2013).

[29] *See Wasden*, 836 F.Supp.2d 1146, 1163;  *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence,* 108 F. Supp. 2d 73, 81 (D.R.I. 2000); *Cuyahoga Cnty. Bd. of Commissioners*, 781 N.E.2d 951, 968.

[30] *Allbaugh,* 295 F.3d 28 (D.C.Cir. 2002); *Snyder*, 729 F.3d 572 (6th Cir. 2013); *Branstad*, 2011 WL 4004652 (Governor's executive order prohibiting state and political subdivisions from entering into PLAs on state-funded construction projects was proprietary and not preempted by the NLRA); *George Harms Constr. Co. v. N.J. Turnpike Authority,* 137 N.J. 8 (1994) (New Jersey supreme court finding that state was acting as proprietor or purchaser of labor in construction industry when prohibiting a project labor agreement specification in public contracts).

enter into, a PLA, presumably depending upon whether it is likely to increase or to decrease their costs." *Id.* at 30. That the restriction was regulatory because it applied to projects merely funded by the Government was, in the court's opinion, an argument "that proceeds from too crabbed an understanding of proprietorship." *Id.* at 35. "[T]he Government unquestionably is the proprietor of its own funds, and when it acts to ensure the most efficient use of those funds, it is acting in a proprietary capacity." *Id.* If the Government acts as a benefactor or lender just as a private benefactor would, the Court reasoned, the Government similarly would be concerned about the efficient use of its funds; the distinction was not relevant in that case. *Id.* The blanket rule— applicable to all government contractors, "but not to the non-government contracts of those who do business with the Government"—was not inconsistent with the actions of a proprietor. *Id.* The Court explained: "A condition that the Government imposes in awarding a contract or in funding a project is regulatory only when, as the Supreme Court explained in *Boston Harbor*, it 'address[es] employer conduct unrelated to the employer's performance of contractual obligations to the [Government].'" *Id.* at 36 (citing *Boston Harbor,* 507 U.S. at 228–29). The impact of the prohibition only extended to projects funded by the Government and not on projects unrelated to those in which the Government had a proprietary interest. *Id.* Thus, the court concluded that the executive order "establishe[d] no condition that can be characterized as regulatory." *Id.*

In *Snyder*, a Michigan legislative act, the Fair and Open Competition in Governmental Construction Act, was challenged as being preempted by the NLRA. 729 F.3d at 575. The Act initially stated that its purpose was to "provide for fair and open competition in governmental construction contracts, grants, tax abatements, and tax credits" and barred governmental units from entering or expending funds on a project if the contract or any subcontract contained a

PLA. *Id.* It also forbade any governmental units from placing any PLA terms in bid specifications, project agreements, or other controlling documents. *Id.* The Act was amended and clarified, stating that the purpose was "to provide for more economical, nondiscriminatory, neutral, and efficient procurement of construction-related goods and services by this state…" as well as "providing for fair and open competition," which would best effectuate that intent. *Id.* at 576. The Act also only forbade governmental units from entering into PLAs themselves or discriminating in favor of or against bidders on public projects based on whether the bidder had entered into a PLA. *Id.* The amended version was found to be proprietary as the state was "seeking to preserve taxpayer resources by encouraging open competition among potential contractors and subcontractors." *Id.* at 577. It did not ban PLAs or the use of PLAs on public projects, and private entities, including those working on government projects, remain free to enter into PLAs. *Id.* at 577–78. "The law's effect is limited to forbidding governmental units from entering into PLAs and then forcing the terms and conditions found within on bidders, contractors, and subcontractors." *Id.* at 577.

The court looked to the legislative intent as expressed in the statute as evidence of intent as well as the legislative history and comments from certain senators. *Id.* at 577–78. The court found that the limits or scope of the act demonstrated proprietary nature in that it only affected actions of the state and had no effect on private parties. *Id.* In response to the argument that PLAs would be ineffective if not applied to every contractor on the project, the court noted that the governmental unit could give subcontracting power to one general contractor who could enter into a PLA. *Id.* at 578. The council argued that the statute was too broad because it did not consider projects on case-by-case basis, to which the court responded that private proprietors do act in across-the-board basis without becoming regulators. *Id.* The court opined that "[t]he

legislature permissibly decided that public resources would best be preserved by taking the PLA decision out of the hands of governmental units and leaving it to private contractors." *Id.* at 578. As compared to *Boston Harbor,* the court found the Michigan legislature stated a similar goal of efficient procurement, and unlike *Gould* or *Brown,* the statute did not evidence facially regulatory intent. *Id.* at 579 and n.4. "Although the legislature acted on all projects at once," the court stated, "unlike the Authority in *Boston Harbor*, that is not alone sufficient to make an action regulatory." *Id.* at 579.

### D.     Market Participant Doctrine Applied to Act 134

Though Act 134 differs from the statute in *Snyder* and executive order in *Allbaugh* in some respects, the differences are not as determinative as Plaintiff suggests.  Despite the existing Supreme Court and Fifth Circuit precedent on the market participant exception and the compelling reasoning of the two Circuit courts that have addressed factually similar issues, the Plaintiff urges the Court to reject the reasoning of *Allbaugh* and *Snyder* and adopt the reasoning of the Ohio State Supreme Court in *Ohio State Build. & Constr. Trades Council v. Cuyahoga Cnty. Bd. of Commissioners,* 98 Ohio St.3d 214 (Ohio 2002), which found a similar state statute preempted by the NLRA.  With this in mind, the Court now turns to the application of the market participant doctrine in the instant matter.

### i.     Efficient Procurement

When examining whether the challenged action, the state legislation, reflects the efficient procurement of goods and services, the court must turn to the manifest purpose and effect of the legislation. *See Gould*, 475 U.S. at 1064.  In assessing whether legislation has a regulatory purpose, the court should "look[] primarily to the objective purpose clear on the face of the enactment" and "not search for an impermissible motive where a permissible purpose is

apparent." *Bldg. Indus. Elec. Contractors Ass'n*, 678 F.3d at 191. "Federal preemption doctrine evaluates what legislation *does*, not why legislators voted for it or what political coalition led to its enactment." *Id.* (quoting *Lavin,* 431 F.3d at 1007 (internal quotation marks omitted)).

Though courts have looked to explicit legislative statements of purpose in preambles to statutes for evidence of intent,[31] no such explicit statement of purpose exists for Act 134. Defendant and Intervenors offer legislative committee minutes as evidence of the legislature's intent in enacting of Act 134, but Plaintiff finds the lack of a preamble evidence of an improper purpose and opposes the use of the committee minutes based on Louisiana's own statute proscribing this use. *See* La. R.S. 24:177(E)(3) ("Committee minutes . . . shall not constitute proof or indicia of legislative intent."). Yet it is the purpose and effect of the statute that are paramount,[32] not the absence of a legislative preamble evidencing the legislature's intent or the presence of legislative committee minutes.  The Court finds that in this case the text and context of the law alone sufficiently demonstrate the purpose and effect of the law.  *See* La. R.S. 24:177(B)(1)("The text is the best evidence of legislative intent.").

From the face of the statute, it is clear that the purpose pertains to the purchase of construction services through a particular contract form (a PLA), on a "public works" project with the use of state funds.  Act 134 applies to public entities "when engaged in procuring products or services or letting contracts" for construction of public works "paid for in whole or in part by state or local funds" or when overseeing the procuring of products or services for the same. La. R.S. 38:2225.5(A).  It is clear that the State is concerned with the "procurement of goods or services" through contracting for construction services in relation to construction

---

[31] *See, e.g., Brown*, 554 U.S. at 70; *Snyder,* 729 F.3d at 576; *Wasden*, 836 F.Supp. at 1163.
[32] *Gould*, 475 U.S. at 291; *see also Cardinal Towing*, 180 F.3d at 693–94 (examining the content and effect of City's contractual provisions)

contracts for "public works," which by definition the public entity owns, uses, or leases.[33]  The State's ownership and interest in its own funds as well as its contracting to acquire and purchase services itself demonstrates the proprietary nature of the law. The State chooses to employ its funds for a project, often on its own land as owner-developer.  *See Boston Harbor*, 507 U.S. at 231–32 (MWRA as public owner-developer acted as proprietor in contracting for PLA).

The proprietary interest derives not only from the ownership of the project constructed but from the use of its funds.  As the Supreme Court in *Brown* recognized, the state has a legitimate proprietary interest in ensuring state funds are spent in accordance with the purposes for which they are appropriated. *Brown*, 554 U.S. at 70. Thus, whether as owner or benefactor of a project, the state is "unquestionably the proprietor of its own funds, and when it is acts to ensure the most effective use of those funds, it is acting in a proprietary capacity." *Allbaugh*, 295 F.3d at 35.  By making a procurement policy on construction contracts, Act 134 evidences the State's entry into the market, whether legislatively or through individual public entities' contracting decisions.  Indeed, in *Cardinal Towing*, the city contracted for towing services, thus participating in the market as a consumer (on behalf of the absent owner of the vehicle) without utilizing its spending power or being the owner of the property towed. *Cardinal Towing*, 180 F.3d at 697.

Notwithstanding the text of Act 134, the placement of Act 134 within the context of the public bid law reinforces the purpose of the law.[34]  Act 134 was enacted as part of the Louisiana Public Bid law specifically "relative to contracts by public entities" and to provide certain

---

[33] La. R.S. 38:2211(12)(" 'Public work' means the erection, construction, alteration, improvement, or repair of any public facility or immovable property owned, used, or leased by a public entity.").

[34] *See Snyder*, 729 F.3d at 575 (Michigan's Fair and Open Competition in Governmental Construction Act's goal was to provide for more economical, nondiscriminatory, neutral and efficient procurement of construction-related goods and services); *but cf. Wasden*, 836 F.Supp.2d at 1163 (Idaho's Open Access to Work Act reflected a regulatory purpose related to employees' right to work).

restrictions. The Public Bid law, which requires a competitive bidding process, seeks to foster

open competition.  "The statute was enacted in the interest of the taxpaying citizens and has for

its purpose the protecting of them against contracts of public officials entered into because of

favoritism and involving exorbitant and extortionate prices." *Hamp's Const.,* 924 So. 2d at 107;

*see Haughton Elevator Div. v. State, Through Div. of Admin.,* 367 So. 2d 1161, 1164-65 (La.

1979).  Act 134 imposes restrictions on bids and types of contracts that the public entities may

enter into on state funded construction projects. Presumably, the state has restricted the bidding

in a way consistent with the general purpose of the public bid law, which existed previously, in

fostering open competition.[35]  Such competition would allow the competitive bidding process to

function as intended in selecting the lowest responsible bidder and in theory provide the state

with the most economical bid for the construction project.[36]  Based on the context of the statute,

it is clear that the law is concerned with the most efficient procurement of these services.

Moreover, the state has acted similar to a private purchaser in determining whether it will

or will not permit its agents to choose to enter into PLAs.  Just as the state spending power

cannot automatically be assumed to be proprietary, "the presence of the state in the market

cannot automatically be assumed to be motivated by a regulatory impulse." *Cardinal Towing*,

180 F.3d at 692.  Here, a private actor may freely refuse to enter into PLAs with a union as a

---

[35]Louisiana courts have long held that "those who enact statutory provisions are presumed to act deliberately and with full knowledge of existing laws on the same subject [ . . . and] with knowledge of the effect of their acts and a purpose in view." *Borel v. Young*, 2007-0419 (La. 11/27/07), 989 So. 2d 42, 48, *on reh'g* (July 1, 2008)(citations omitted). The meaning and intent of a law is determined by "considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law." *Colvin v. Louisiana Patient's Comp. Fund Oversight Bd.*, 2006-1104 (La. 1/17/07), 947 So. 2d 15, 19 (*citing Moss v. State*, 05–1963 (La.4/4/06), 925 So.2d 1185); *see Rebel Distributors Corp. v. LUBA Workers' Comp.*, 2013-0749 (La. 10/15/13), 144 So. 3d 825, 838 ("The placement of La. R.S. 23:1205 in the workers' compensation laws reinforces such an interpretation of La. R.S. 23:1205(A)").

[36] *See New York state Chapter, Inc. v. New York State Thruway Authority*, 88 N.Y.2d 56, 68 (N.Y. 1996)(stating that one of the main purposes of the New York competitive bidding statutes, similar to Louisiana's public bid law, was protection of the public fisc by obtaining the best work at the lowest possible rate).

market participant.[37]  The construction proviso of the NLRA permits employers in the construction industry to enter into prehire agreements, but nothing prevents an employer from refusing to do so. The State as has similarly acted as a market participant would in deciding that, to most efficiently procure construction services, the decision of entering into a PLA should be left to the private contractors and not the public entities. *See Snyder*, 729 F.3d at 578. The decision amounts to "nothing more than the public equivalent of a corporation's by-law regarding the purchase of construction services" that its officers or employees should not use a certain mode of contracting that the corporate entity determines is economically inefficient.[38] Though Plaintiff suggests that the State has acted as a regulator in including the enforcement provision in Section (D)[39] of Act 134, the substance of the provision simply enforces the State's rule as to contractual provisions in its construction contracts.  Far from interfering with the purpose of the NLRA, the State's action exemplifies it: the NRLA does not interfere with the substance of the contractual provisions between bargaining parties but allows those parties to enforce them.[40]  In light of the purpose and effect of the statute, the state through its legislature has acted in a proprietary capacity in the same manner as a private actor could have.

---

[37] *See United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624-25 (5th Cir. 2010)("A state is a market participant if it is purchasing or selling a product or service; in such cases, it can choose its contracting partners as if it were a private party and can choose to deal preferentially with in-state entities.").

[38] *George Harms*, 137 N.J. at 27; *see also Am. Trucking Associations, Inc. v. City of Los Angeles, Cal.*, 133 S. Ct. 2096, 2102-03, 186 L. Ed. 2d 177 (2013) ("The Port here has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic.").

[39]Section (D) of Act 134 likely supersedes the more general enforcement provision of La. R.S. 38:2220. *See Capital City Press, L.L.C. v. Louisiana State Univ. Sys. Bd. of Sup'rs, 2013-2001* (La. App. 1 Cir. 12/30/14) (La. Ct. App. Dec. 30, 2014) ("In addition, a general rule of statutory construction is that a specific statute controls over a broader, more general statute. It is a fundamental rule that when two statutes deal with the same subject matter, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character." (citation and internal quotation marks omitted)).

[40]*But see Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 425-26 (3d Cir. 2011)(stating that a state may act as a market regulator where it employs coercive tools that no private actor could wield, such as the threat of civil fines, to effectuate compliance with contractual provisions, while a private actor must rely on contractual remedies.)

### ii.     Narrow Scope

The second part of the *Cardinal Towing* test examines the scope of the action and questions whether the narrow scope of the challenged action defeats an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem. The Fifth Circuit recognized that not all state spending decisions are presumptively proprietary:

> States have methods of influencing private conduct unrelated to the state's proprietary functions—and thus potentially disrupting a congressional plan—at their disposal that extend beyond traditional overt regulation. One such method is deployment of a state's spending power in a manner calculated to encourage or discourage such private behavior.

*Cardinal Towing,* 180 F.3d at 691. Plaintiff argues that Act 134 is not proprietary because the prohibition is not tailed to one specific job but *all* PLAs entered into by the state, and that the regulatory purpose is clear: it regulates not only those contractors bidding for projects with the state but effectively forbids contractors to enter into PLAs with subcontractors. While "ad hoc" decisions, such as the MWRA's decision in *Boston Harbor*, undoubtedly demonstrate proprietary conduct, a decision made through a blanket prohibition, on the other hand, may appear regulatory upon first glance.  The inquiry into the scope of the act under the *Cardinal Towing* test becomes even more germane in this instance.  Though ad hoc decisions eschew regulatory purpose, it does not necessarily follow that "blanket" prohibitions cannot evidence proprietary purpose.  Both *Allbaugh* and *Snyder* relied on the purpose and effect of the executive order and state legislation at issue, respectively, in determining that the scope did not defeat the proprietary nature.  *See Allbaugh,* 295 F.3d at 35–36; *Snyder,* 729 F.3d at 580.  By contrast, the Ohio Supreme Court focused on the form of the act (a flat-out prohibition) and relied heavily on the comparison between state and private action, rather than examining the scope—the effect— of the statute.  *See Cuyahoga Cnty.,* 781 N.E.2d 951 969–970.  This Court finds the Ohio

Supreme Court's reasoning unpersuasive and will examine the effect of the statute in

ascertaining whether its scope defeats an inference of a regulatory rather than proprietary goal.

Through Act 134, the Louisiana legislature has circumscribed public officials' ability to

determine whether to enter into a PLA and incorporate a PLA into a bid or controlling document

on a public works construction project.  The effect of this corporate or "executive" decision is no

different than the effect of a public officer deciding "each and every time . . . not to enter into

PLAs for any specific project." *Branstad*, 2011 WL 4004652 at *10.[41]  A state may consistently

decide not to enter into PLAs and yet not convert the consistent proprietary decisions into a

single regulatory one.[42]  Using state funds efficiently furthers the state's proprietary interest in

ensuring the funds are spent for the purpose appropriated—whether for all contractual

obligations or one a single contract.[43] Here, the state did not restrict its choices to promote

enforcement of a labor policy or in such a way calculated to encourage or discourage private

behavior. Thus, there is simply "no logical justification for holding that if [a state statute]

establishes a consistent practice regarding the use of PLAs, it is regulatory even though the only

---

[41] *See also Bldg. Industry Elec. Contractors Ass'n*, 678 F.3d at 192 ("It is hard to see why, even if political favoritism was a motivating factor in the City's decision to contract with particular contractors or unions, the PLAs would be thereby transformed from contracts into *regulations*.")

[42] *Snyder*, 729 F.3d at 579 ("Although the legislature acted on all projects at once, unlike the Authority in *Boston Harbor*, that is not alone sufficient to make an action regulatory."); *Branstad*, 2011 WL 4004652, at *9 ("The Court does not find a difference between Governor Branstad issuing countless Executive Orders each time the State enters into projects (whether state-owned or state-funded) or one Executive Order banning PLAs from every project. If twenty projects in a row were each declared, ad hoc, to prohibit PLAs, the intent and the result would be the same. It would be a de facto "policy" against PLAs. The State is acting as a proprietor to prohibit PLAs and, because the State has the right to do this, it has the right to make this determination in the manner it sees fit."); *Bldg. Indus. Elec. Contractors Ass'n*, 678 F.3d at 192 ("It is hard to see why, even if political favoritism was a motivating factor in the City's decision to contract with particular contractors or unions, the PLAs would be thereby transformed from contracts into *regulations*.").

[43] *Bldg. Indus. Elec. Contractors Ass'n*, 678 F.3d at 191-92 (2d Cir. 2012) ("It cannot be correct that to qualify for the exception, the City must show that its contracts are maximally efficient. 'Acting like a proprietor' does not mean acting exclusively with the narrow goal of minimizing costs regardless of consequences. Private proprietors are entitled to, and sometimes do, prefer working with familiar faces or contracting with larger entities that can consistently and simply provide all their requirements. These practices may reflect long-run economic rationality. But even if they do not, accepting BIECA's restrictive theory of economic rationality would expose every public PLA to challenge based on speculative ex post evaluations of whether the PLAs in fact proved economically prudent."(citations omitted)).

decisions governed by [it] are those that the [state] makes as [a] market participant." *Allbaugh*, 295 F.3d at 35.

Notwithstanding the permissible proprietary goal of the "blanket prohibition," the legislation may be regulatory and preempted if it interferes with the comprehensive scheme established by the NLRA. *See Brown*, 554 U.S. at 73–74. The *Boston Harbor* Court noted that it was the state's regulating conduct "unrelated to the employer's performance of contractual obligations" in *Gould* that was determinative in that case. 507 U.S. at 228–29. Indeed, the "line between state regulation that is subject to preemption and market participation that escapes preemption must be drawn more finely than by simply distinguishing between regulation through mandatory laws and regulation achieved through the spending or procurement power." *Sage Hospitality*, 390 F.3d at 214. Thus, as in *Gould* and *Brown* where each state deployed its spending power to achieve a goal far broader than merely protecting its own proprietary interests, "[c]onditions on spending may become regulation if they affect conduct other than the financed project." *Lavin*, 431 F.3d at 1006–07.

Despite Plaintiff's broad interpretation of Act 134, the Act does not affect conduct unrelated to the State's contracts. Act 134 applies only to public works projects and does not forbid any collective bargaining agreement between private parties. It does not even ban the use of PLAs on all State or government projects. The Act prohibits public entities from making the decision to enter into a PLA; as in *Snyder*, that decision is left to individual contractors. *See Snyder,* 729 F.3d at 578. In light of its narrow application to State contracts, the Act specifically states that nothing shall in the Act prohibit subcontractors and contractors from entering into PLAs or other collective bargaining agreements. *See* La. R.S. 38:2225.5(C). Act 134 goes so far as to exempt public-private projects over which a private entity would have the right to control

the labor relations on the project.  *See id.* at (E)(4). Although Plaintiff argues that section (B) of the Act would prohibit a private entity receiving government funds, such as tax increment financing, from entering into a PLA on a private project, this argument misconstrues the statute in applying it to private projects[44] and wrongly assumes that the state would not have a proprietary interest in the efficiency of public construction projects financed in part by public funds.  To the extent that the Act appears to allow discrimination against contractors or bidders who are *parties* to PLAs, as Plaintiff infers from the absence of such prohibition, to give effect to the text of the statute's authorization of PLAs between contractors and subcontractors, the projects should be limited to "public works" that are distinct from "private-public" projects and should not prohibit contractors from entering into PLAs with subcontractors.  Moreover, as to the alleged prohibition of neutrality agreements, the Act, by its language, does not prohibit neutrality agreements between the state and the union, but only from forcing a contractor to agree to be bound by that agreement.[45]

Finally, the court is reluctant, as other courts have been, to examine the statute for any further ulterior motive, particularly where a permissible motive is apparent.[46]  To the extent that

---

[44]Though Plaintiff states the prohibitions in Section(A) applies to "any project," this term is qualified by the rest of the section and applies only to those projects where the bids, project agreements, or controlling documents would contain the provisions proscribed in Section (a)—in other words, on construction projects. *See id.* at (A).

[45]While Plaintiff argues that the Act impermissibly prohibits a labor organization from entering into a neutrality agreement with a public entity, it is not clear that the Act functionally prohibits this agreement. Notwithstanding uncertainty surrounding the lawfulness of neutrality agreements generally, the Act does not prohibit voluntary recognition agreements of all forms, as Plaintiff seemingly suggests, but merely prohibits one particular condition (remaining neutral) of one type of voluntary recognition agreement (neutrality agreement). More importantly, the Act only prohibits *offerors, bidders, contractors, subcontractors, or operators* from entering into an agreement whereby the *public entity* must remain neutral to the labor organization—it prohibits a provision requiring neutrality *between the public entity and a labor organization* from being incorporated into a controlling document. It does not prevent the labor organization from entering into an agreement with the public entity alone. Even if this type of agreement would allow the labor organization to achieve majority status under Section (9)(a) of the NLRA, it is not the only mode for doing so. Finally, unlike prehire agreements, the NLRA does not specifically allow neutrality agreements, and Plaintiff cannot argue that it has a "right" to enter into this type of agreement. *A fortiori* any of the Court's discussion as to the Act's proprietary nature as to PLAs also applies to the neutrality provision in Section (A).

[46] *See Johnson,* 623 F.3d at 1026–27.("Plaintiffs contend that the [PLA]'s primary purpose was to reward the unions that supported the Measure E campaign.... [W]e are quite certain that Congress did not intend for the NLRA's or

an impermissible purpose—to interfere with federally regulated labor relations—could have motivated the Act, the text of the Act mitigates this concern where it states that the provisions of the statute apply "[e]xcept as . . . required by federal law." La. R.S. 38:2225.5(A).[47] Considerations such as whether State's actions actually further the goal of efficient procurement, the prudence of the law, or whether the State "made a good business decision," do not affect the analysis. *Johnson*, 623 F.3d at 1025 (2010); *see Int'l Truck and Engine Corp. v. Bray*¸ 372 F.3d 717, 728 (5th Cir. 2004) ("[W]e cannot 'second-guess the empirical judgments of lawmakers concerning the utility of legislation.'"(citation omitted)). Furthermore, the Supreme Court has emphasized that there is no rule that "state purchasing decisions may never be influenced by labor considerations." *Boston Harbor,* 507 U.S. at 229 (citing *Gould*, 475 U.S. at 291). Therefore, based on the proprietary nature of the statute and narrow scope, the Court finds that Act 134 reflects the State's interest in efficient procurement of construction services as a market participant.

In light of the above discussion, the proprietary nature and the narrow scope of the legislation are evident. The State was acting not as a regulator but as a market participant in enacting Act 134, and the Court finds that the NLRA should not preempt Act 134.  Though Plaintiff argues that the Act prevents labor organizations from exercising their "right" to convince governmental entities to enter into a PLA with the labor organization and interferes with an area left unregulated by Congress, these arguments that pertain to *Garmon* and *Machinists* preemption are of no avail when the state acts as a market participant.

---

ERISA's preemptive scope to turn on state officials' subjective reasons for adopting a regulation or agreement."); *Bldg. Indus. Elec. Contractors Ass'n*, 678 F.3d at 191 ("Moreover, it is difficult to discern officials' motives given the complex workings of government. *See Bush v. Vera,* 517 U.S. 952, 1012–14 & n. 9, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (Stevens, J., dissenting) (discussing difficulty of determining legislature's "predominant" motive for passing a law, and collecting cases).").

[47]*Lavin*, 431 F.3d at 1006–07 ("Federal preemption doctrine evaluates what legislation *does,* not why legislators voted for it or what political coalition led to its enactment.").

In finding that the market participant applies to Act 134, the Court is mindful of "the volume of, and obvious need for, interaction between the government and the private sector, [and avoiding] the application of preemption in a manner that hobbles state and local governments' purchasing efforts [and] threatens severe disruption." *Cardinal Towing*, 180 F.3d at 692.  The Court is reluctant to infer preemption in light of existing precedent and the absence of Congressional intent to the contrary. *See Boston Harbor,* 507 U.S. at 231–232; *Garmon,* 359 U.S. at 244; *Sears,* 436 U.S. at 188–89, and n.13.  Congress balanced the employee's right to select a bargaining representative and an employer's right to choose to associate with a union with accommodating the construction industry's established practices, opting to promote the latter in enacting Sections 8(f) and 8(e) and allowing construction industry employers the opportunity to continue industry practices.  In this case, to deny the state the an option available to a private purchaser in the construction market where Congress has acted to allow market participants the choice to engage in industry contracting practices would arguably "place a restriction on Congress' intended free play of economic forces identified in *Machinists.*" *See Boston Harbor*, 507 U.S. at 232.

IV.     **CONCLUSION**

In sum, the Court finds that the NLRA does not preempt Act 134 of the Louisiana legislature. Therefore, as no genuine issue of material fact exists, the Defendant is entitled to judgment as a matter of law on this matter.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (R. Doc. 39) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant and Intervenor's Motion for Summary

Judgment (R. Doc. 40) is **GRANTED.**

New Orleans, Louisiana, this 27th day of _____ May _____, 2015.

_____

**STANWOOD R. DUVAL, JR.**
**UNITED STATES DISTRICT JUDGE**